Louis P. KOCSIS, Plaintiff,

v.

STANDARD INSURANCE COMPANY, Defendant.

No. Civ.A. 3:00–CV–487(JCH).

United States District Court, D. Connecticut.

April 12, 2001.

F. Patrick O'Sullivan, Furey, Donovan, Eddy, Kocsis, Tracy & Daly, Bristol, CT, for Plaintiff.

George J. Kelly, Jr., Siegel, O'Connor, Schiff & Zangari, New Haven, CT, Eric Paltell, Piper Marbury Rudnick & Wolfe LLP, Baltimore, MD, for Defendant.

### RULING ON MOTION FOR SUMMARY JUDGMENT [DKT. NO. 17]

HALL, District Judge.

The plaintiff Louis Kocsis brings this civil action against the defendant Standard Insurance Company ("Standard") for denial of disability benefits under a Long Term Disability Plan issued by Standard to the plaintiff's employer. This plan is an employee welfare benefit plan under the Employment Retirement Income Security Act ("ERISA"). As such, the plaintiff's action for wrongful denial of long term disability benefits is a claim under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

Now before the court is Standard's Motion for Summary Judgment [Dkt. No. 17] on the plaintiff's claim. For the reasons that follow, the motion is granted.

### I. FACTS

#### A. The Plan

The following facts are undisputed. The plaintiff, a 61–year–old man, was an employee of Furey, Donovan, Eddy, Kocsis, Tracy & Daly, P.C. ("Furey"). As such, he was covered by Furey's Long Term Disability Plan ("Plan"). The Plan was issued by Standard, effective December 1, 1995, with Standard acting as Administrator of the Plan.

The Plan provides the plaintiff with long term disability ("LTD") benefits up to age 65, provided the plaintiff meets the following definition of disability:

> During the Benefit Waiting Period and Own Occupation Period you are required to be disabled only from you own occupation. You are disabled from your Own Occupation if, as a result of Sickness, Injury or Pregnancy, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation.

Certificate and Summary Plan Description: Group Long Term Disability Insurance (hereinafter "Policy") at D 10009, attached as Ex. A to Attachment 1 of Defendant's Local Rule 9(c) 1 Statement (Dkt. No. 19). The Plan also provided certain limitations on coverage, including a Mental Disorder Limitation that limits LTD benefits to twenty-four (24) months. *See id.* at D 10016. Under the section entitled "Allocation of Authority," the Plan includes the following language:

> Except for those functions which the Group Policy specifically reserves to the Policyowner, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy. Our authority includes, but is not limited to:
>
> 1. The right to resolve all matters when a review has been requested;
>
> 2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
>
> 3. The right to determine:
>
> a. Your eligibility for insurance;
>
> b. Your entitlement to benefits;
>
> c. The amount of benefits payable to you;

d. The sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.

*Id.* at D 10017.

## B. The plaintiff's medical conditions and treatment

The plaintiff was originally diagnosed with mild mitral insufficiency by Dr. Michael Rossi in September 1984, with which condition the mitral valve in the plaintiff's heart was not closing properly. In 1996, the plaintiff began experiencing symptoms of increased fatigue and sleepiness. Dr. Rossi told the plaintiff that his symptoms might be alleviated by surgery to repair the mitral valve.

Dr. Rossi thereafter referred the plaintiff to Dr. Raymond McKay for a cardiac catheterization to confirm the need for mitral valve surgery. Following the procedure, Dr. McKay diagnosed the plaintiff with severe mitral regurgitation and prescribed consultation with a cardiac surgeon to evaluate whether mitral valve repair/replacement was warranted. The procedure demonstrated no evidence of coronary artery disease.

On August 6, 1996, Dr. Henry Low performed an operative procedure of mitral valve replacement, and the plaintiff was then discharged without complication on August 14, 1996. On October 18, 1996, the plaintiff had an echocardiogram performed, the report from which explained that the mitral regurgitation was markedly improved due to the valve replacement surgery. The report also noted that atrial fibrillation, a disorder of heart rate and rhythm in which the upper heart chambers are stimulated to contract in a very rapid

and/or disorganized manner, was present during the study.

On March 10, 1997, the plaintiff was seen by Dr. Low. In conjunction with that visit, Dr. Low sent a letter to Dr. Rossi explaining that the plaintiff had not done well since his mitral valve replacement surgery and that the plaintiff would undergo implantation of a pacemaker. Dr. Low also noted that the plaintiff was obviously depressed and that the plaintiff complained that he was unable to make decisions and was very unhappy. Dr. Low finally noted that the plaintiff would be seeing Dr. Laurence Goldstein for a psychiatric evaluation the next day.

Beginning on March 11, 1997, the plaintiff underwent a psychiatric evaluation and treatment by Dr. Goldstein. On March 12, 1997, Dr. Low performed the pacemaker implantation, which occurred without complication. The plaintiff was discharged on March 15, 1997. During the plaintiff's hospital stay, he was seen by psychiatric services.

On March 31, 1997, Dr. Low sent a postoperative follow-up letter to Dr. Rossi explaining that the plaintiff's wounds from the surgery had healed nicely but that the plaintiff was still obviously depressed as before and was being treated by Dr. Goldstein.

## C. The plaintiff's disability claim

Due to his mitral valve replacement surgery, the plaintiff remained out of work from July 30 to September 30, 1996, before returning to work at Furey on October 1, 1996. After returning to work on October 1, the plaintiff had difficulty integrating himself back into his law practice and began experiencing increased palpitations, dizzy spells, and vision problems. By February 10, 1997, the plaintiff stopped working as an attorney for Furey.

The plaintiff submitted a claim dated February 24, 1997 for LTD benefits to Standard, citing as his illness heart condition, with symptoms of open heart surgery and replacement of his mitral valve. Also submitted to Standard in support of this claim was an Attending Physician's Statement from Dr. Rossi, dated March 7, 1997. Dr. Rossi listed a primary diagnosis of mitral insufficiency and a secondary diagnosis of rheumatic heart disease and atrial fibrillation. The listed symptoms were shortness of breath, palpitations, near syncope and syncope, or fainting. According to Dr. Rossi, the plaintiff was not able to continue to perform as a trial lawyer with an active law practice due to the stresses and hours involved and the demands this occupation placed on him physically and mentally. Dr. Rossi indicated that he recommended the plaintiff stop working on March 7, 1997, due to fatigue, exertional dypsnea, syncope and near syncopal episodes. Dr. Rossi also described the plaintiff's mental and physical limitations preventing the plaintiff from working as a trial lawyer as permanent and indicated that no reasonable work or job site modifications were possible to assist the plaintiff to return to work.

On April 17, 1997, Dr. Goldstein sent a letter to Standard concerning the plaintiff's claim for disability benefits. Dr. Goldstein opined that the plaintiff had clearly been disabled mentally and physically since his valve replacement in August, 1996. Dr. Goldstein explained that, at the time of the initial psychiatric evaluation on March 11, 1997, the plaintiff was severely depressed and was experiencing symptoms of a depressive disorder that probably began in January 1996 when the plaintiff was told his mitral valve showed significant dysfunction and required surgery. As of April 17, 1997, Dr. Goldstein indicated that the plaintiff had shown improvement, in that his mood was brighter, his suicidal thoughts were resolved, and his anxiety was abated, but that the plaintiff still appeared to lack motivation, found it difficult to concentrate, and continued to obsess about his medical issues, i.e., the prosthetic mitral valve, his medication, and his pacemaker.

Dr. Goldstein also submitted to Standard a Psychiatric Questionnaire dated April 10, 1997. In this document, Dr. Goldstein diagnosed the plaintiff with "major depression, single episode, severe," and "panic disorder with agoraphobia." Dr. Goldstein noted that the plaintiff experienced occupation problems and health-related psychosocial and environmental problems. According to Dr. Goldstein's Questionnaire, the plaintiff had great difficulty concentrating, had poor ability to concentrate and poor motivation, and indicated that the plaintiff's "impairment appears to be functional although low cardiac state experienced in late 1996 may have played a role." The Questionnaire rated the plaintiff with a 50 out of 100 score on the Global Assessment of Functioning ("GAF") scale, which translated to "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." The Questionnaire noted that the plaintiff rated a 20 out of 100 on the GAF scale at his initial evaluation, which score indicates "[s]ome danger of hurting self or others (e.g. suicide attempts without clear expectation of death; frequently violent; manic excitement) ...." Dr. Goldstein further noted that the plaintiff's psychological condition was contributed to by health related issues and that the plaintiff would be unable to handle any of the stresses of his position as a self-employed attorney at that time. Dr. Goldstein indicated that he could not determine a return to work date, but that

he expected the plaintiff's condition to improve.

Dr. Rossi sent a letter dated August 27, 1996, to Phoenix Insurance Company, another disability insurance company with which the plaintiff had a policy, indicating that the plaintiff was experiencing atrial fibrillation and advising that the plaintiff had been placed on Digoxin to control the condition. Standard received a copy of this letter. In a June 9, 1997 letter, received by Standard, Dr. Rossi wrote that the plaintiff was totally and permanently disabled from any kind of gainful employment. In a July 16, 1997 letter to Phoenix, copied to Standard, Dr. Rossi advised that the plaintiff has chronic atrial fibrillation, which will not change. Dr. Rossi also indicated that the plaintiff was seen by a neurologist, Dr. Bilchik, who believed that the plaintiff was having transient ischemic attacks. Dr. Rossi advised that a February 27, 1997 echocardiogram showed no change from the results of the October 1996 echocardiogram, despite the pacemaker, Digoxin, and mitral valve replacement, and that the plaintiff was disabled due to a dilated left ventricle with impaired left ventricle function and an ejection fraction in the range of 40–45%, which condition Dr. Rossi opined would not improve. Dr. Rossi indicated that the plaintiff's atrial fibrillation impaired his ability to do sedentary work due to fatigue and diminished exercise tolerance. As such, the plaintiff could not, in Dr. Rossi's estimation, involve himself in the stresses of an active law practice which could, during periods of stress, significantly alter the plaintiff's cardiac hemodynamics. Dr. Rossi opined that he considered the plaintiff totally and permanently disabled by a separate disability from his psychiatric impairment.

On November 21, 1997, the Social Security Administration's Retirement, Surviv-ors and Disability Insurance informed the plaintiff, in a letter forwarded to Standard, that the SSA had determined that he was disabled as of February 7, 1997. The SSA informed the plaintiff that he was therefore entitled to monthly disability benefits beginning August 1997.

### D. Standard's review process

After receiving the plaintiff's claim for disability benefits, Standard's Group Benefits Department assigned the plaintiff's claim to Disability Analyst Steven Leask. Leask had the plaintiff's claims file reviewed by Dr. Bradley Fancher, an internist who consults with Standard on its disability claims. In a report dated May 21, 1997, Dr. Fancher opined that, from a cardiac standpoint, the plaintiff would be capable of performing sedentary to light duty work on a full time basis. Dr. Fancher also concluded that work-related stress would not adversely affect the plaintiff's heart condition. Dr. Fancher further opined that, based on Dr. Goldstein's diagnosis of major depression and panic disorder, the plaintiff appeared to be psychiatrically impaired and unable to work at that time.

On June 11, 1997, Leask sent the plaintiff a letter awarding him disability benefits on the basis of disability due to depression. Leask further explained in the letter that, because depression is a mental disorder, Standard was applying the mental disorder limitation to restrict the plaintiff's benefits to twenty-four months, such that benefits would be awarded from May 9, 1997, to May 9, 1999, so long as the plaintiff remained disabled during that time period as defined by the LTD Plan. Leask also explained that there was insufficient evidence in the plaintiff's claims file and based on Dr. Fancher's opinions to find the plaintiff disabled due to his cardiac condition. Leask also notified the plain-

tiff's attorney Patrick O'Sullivan that the claims file would be forwarded to Standard's Quality Assurance Unit for an independent review, which unit may reverse or affirm a Group Benefits examiner's decision.

After the file was transferred to Quality Assurance, Standard received Dr. Rossi's July 16, 1997 letter to Phoenix. *See supra* at 8. As a result, the claims file was sent back to Leask to consider this additional information. Leask asked Dr. Fancher to review the letter. Thereafter, Dr. Fancher still opined that the plaintiff's cardiac condition was not disabling but recommended that Standard get a second opinion by obtaining a review of the claims file by a cardiologist.

Standard then had the plaintiff's claims file reviewed by Dr. Henry DeMots, a cardiologist with board certifications from the National Board of Medical Examiners, the American Board of Internal Medicine, and the American Board of Internal Medicine, Cardiovascular Disease. After reviewing the file, Dr. DeMots sent Standard a September 22, 1997 report in which Dr. DeMots concluded that the major disabling symptom in the file was the plaintiff's depression and inability to make decisions as required by an attorney. Dr. DeMots opined that, in contrast to a patient with coronary artery disease, the plaintiff's condition would not indicate a need to avoid psychological stress. Dr. DeMots that the major limiting factor in the plaintiff's disability was his depression, the symptoms of which were not characteristic of cardiovascular conditions or low cardiac output. Dr. DeMots opined that the plaintiff's inability to concentrate and make decisions was probably a psychiatric not a cardiovascular issue.

Leask then had Dr. Fancher review Dr. DeMots's report. On the basis of this report, Dr. Fancher concluded that the plaintiff's impairment was more probably than not due primarily to psychiatric factors.

On October 7, 1997, Leask sent O'Sullivan a copy of Dr. DeMots's report and explained that Dr. Fancher had reviewed the report and agreed that the plaintiff's limitations in performing his own occupation were due to his psychiatric impairment. Leask also explained the that claims file would again be forwarded to the Quality Assurance Unit.

Blanche Sabo of Standard's Quality Assurance Unit thereafter conducted a review of the plaintiff's claims file. In a November 25, 1997 letter to O'Sullivan, Sabo explained that Standard did not have sufficient current information to determine if the plaintiff was disabled within the meaning of the Plan due to his heart condition. She noted that the Group Benefits Department's decision was made based on information received through April 1997 and that any decision about his condition after May 1997 would be premature, especially since the pacemaker surgery occurred in mid-March 1997. Sabo then remanded the claims file back to Leask to gather additional medical records, including updated records from Dr. Rossi, to use in then deciding whether the plaintiff was disabled from his heart condition.

Leask then collected updated medical records, including an April 1998 Attending Physician's Statement from Dr. Rossi. Therein, Dr. Rossi indicated that the plaintiff's condition was improved since the last such statement he submitted, that the plaintiff's physical and mental limitations and work activity restrictions were at that point asymptomatic. Dr. Rossi also indicated that the plaintiff had chronic atrial fibrillation and that he could never return to work.

In October 1999, Standard's Nurse Care Manager Marion Waterman reviewed the plaintiff's claims file and determined that Standard had collected the remainder of the updated medical records. In a letter of October 19, 1999, Waterman sent Dr. DeMots the updated medical file and requested that he opine as to whether his opinion of September 1997 had changed in light of the new records. After reviewing the file, Dr. DeMots sent Waterman an October 25, 1999 letter stating that his prior opinion in his September 1997 report was unchanged.

On November 15, 1999, Senior Disability Benefits Analyst Micah Rubenstein sent a letter to O'Sullivan denying benefits beyond the twenty-four month mental disorder limitation. Rubenstein indicated in the letter that he found, based on the new information received by the Group Benefits Department and the reports of Dr. DeMots, that the Group Benefits Department's prior decision to provide the plaintiff disability benefits under the twenty-four month mental disorder provision was correct.

Rubenstein then forwarded the claims file to Quality Assurance for an independent review. Standard continued to provide benefits to the plaintiff during this period, as it had since May 1997.

Upon receipt of the claims file in the Quality Assurance Unit, Bertha conducted a review of the file. She then sent a January 14, 2000, letter to O'Sullivan. In this letter, she reported her finding that the Groups Benefits Department correctly decided to apply the twenty-four month mental disorder limitation because there was not sufficient medical documentation substantiating that the plaintiff's cardiac condition precluded him from working with reasonable continuity in his own occupation as an attorney from April 1997 and beyond. Bertha noted that Dr. Fancher and Dr. DeMots opined that stress associated with the plaintiff's occupation would not adversely affect his cardiac condition. Bertha also explained that the post-pacemaker-implantation medical records did not reference continuing serious cardiac symptoms but instead indicated that most of the plaintiff's cardiac condition was asymptomatic. Bertha also reported her finding that it was correct to grant the plaintiff disability benefits due to a mental disorder and to limit those benefits under the twenty-four month provision. In support of this conclusion, Bertha referenced the Dr. Goldstein's March 1997 diagnosis of major depression and panic disorder and that the plaintiff's psychiatric condition continued to improve under the care of Dr. Goldstein. Bertha also noted that Dr. Goldstein's records indicated that, as of January 26, 1998, the plaintiff was no longer clinically depressed. Bertha finally advised the plaintiff that Standard would discontinue disability benefits as of January 14, 2000, and close the processing of the plaintiff's claim.

## II. STANDARD OF REVIEW

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir. 2000). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) (quoting Fed.R.Civ.P. 56(c)). "An issue of fact is genuine 'if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "An issue of fact is material 'for these purposes if it night affect the outcome of the suit under the governing law.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505).

"[I]f after discovery, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," summary judgment is appropriate. *Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir.2000) (internal quotation marks omitted) (quoting *Berger v. United States*, 87 F.3d 60, 65 (2d Cir.1996)). "The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. Instead, the non-movant must produce specific facts indicating 'that a genuine factual issue exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted.' To defeat a motion, there must be evidence on which the jury could reasonably find for the [non-movant].'" *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) (citations omitted).

"In deciding the motion, the trial court must first resolve all ambiguities and draw all inferences in favor of the non-moving party, and then determine whether a rational jury could find for that party." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). "If reasonable minds could differ as to the import of the evidence, ... and [i]f ... there is any evidence in the record from any source from which a reasonable inference in the [non-

moving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir.1997) (internal quotation marks omitted) (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988)).

"At the same time, the non-moving party must offer such proof as would allow a reasonable juror to return a verdict in his favor...." *Graham*, 230 F.3d at 38. A plaintiff may not create a genuine issue of material fact by presenting unsupported statements or "sweeping allegations." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir.1997). The non-moving party "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. The motion will not be defeated merely ... on the basis of conjecture or surmise.'" *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996) (citations omitted); *see also* Fed.R.Civ.P. 56(e) (a non-moving party "may not rest upon the mere allegations or denials of the [non-moving] party's pleading").

### III. DISCUSSION

The defendant argues in support of its motion for summary judgment that its denial of disability benefits to the plaintiff under the Plan was not arbitrary and capricious. The plaintiff, citing almost no law, alleges that several genuine issues of material fact exist to preclude summary judgment.

As a starting point, the court notes that there is no dispute that the Plan is an "employee welfare benefit plan" as defined by ERISA. *See* 29 U.S.C. § 1002(1).[1] To determine what standard

1. 29 U.S.C. § 1002(1) provides:

The terms "employee welfare benefit plan"

to apply to the plaintiff's challenge of his denial of benefits, the court must determine, however, whether the Plan confers discretionary authority on the Plan's Administrator. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, [t]he court may reverse only if the fiduciary's decision was arbitrary and capricious." *Rombach v. Nestle USA, Inc.*, 211 F.3d 190, 194 (2d Cir.2000) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir. 1995)) (internal quotation marks omitted). More specifically, "[w]here the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995)).

██ "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since the party claiming deferential review should prove the predicate that justifies it." *Id.* (quoting *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995)). To determine whether an ERISA plan confers discretionary authority on the plan administrator, courts look to the language of the policy, as the Second Circuit has discussed:

> In our Circuit, we have recognized that magic words such as discretion and deference may not be absolutely necessary to avoid a [*de novo* ] standard of review. At the same time, we have noted that the use of such words is certainly helpful in deciding the issue. When we have deemed the arbitrary and capricious standard applicable, the policy language reserving discretion has been clear.

*Id.* at 251 (citations and internal quotation marks omitted).

██ The court concludes that, as a matter of law, Standard has carried its burden of proving that the Plan at issue in this case reserves discretion to the Plan's administrator to determine eligibility for benefits. Here, the language of the plaintiff's policy is explicitly clear: Standard reserves to itself "full and exclusive authority ... to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy," and Standard reserves to itself "[t]he right to determine: a. Your eligibility for insurance; b. Your entitlement to benefits; c. The amount of benefits payable to you; d. The sufficiency and the amount of information we may

and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or bene-

fits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

reasonably require to determine a., b., or c., above." Based on Second Circuit precedent, this language is sufficient, albeit without using the word "discretion" or "discretionary," to trigger the application of the arbitrary and capricious standard. *See, e.g., Rombach,* 211 F.3d at 194; *Jiras v. Pension Plan of Make–Up Artist & Hairstylists Local 798 of the Alliance of Theatrical Stage Employees,* 170 F.3d 162, 166 (2d Cir.1999); *Pagan,* 52 F.3d at 441–42. Moreover, as Standard notes, several courts outside of this Circuit have found identical language in one of Standard's ERISA plans to be sufficient to confer discretion on the plan administrator. *See, e.g., Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 943 (9th Cir.1999); *Stills v. GBMC Healthcare, Inc.,* 48 F.Supp.2d 495, 498 (D.Md.1999).

■ The court must therefore decide whether Standard's denial of benefits to the plaintiff was without reason, unsupported by substantial evidence, or erroneous as a matter of law. *Kinstler,* 181 F.3d at 249. Under this deferential standard, the court is "not free to substitute [its] own judgment for that of the [Plan's administrator] as if [it] were considering the issue of eligibility anew." *Pagan,* 52 F.3d at 442. Thus, "[t]he court may not upset a reasonable interpretation by the administrator." *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.,* 46 F.3d 1264, 1271 (2d Cir.1995). Furthermore, "a district court's review under the arbitrary and capricious standard is limited to the administrative record." *Miller,* 72 F.3d at 1071.

■ In this context, substantial evidence "Is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision-maker and] . . . requires more than a scintilla but less than a preponderance.'" *Id.* at 1072 (quoting *Sandoval v. Aetna Life & Casualty Ins. Co.,* 967 F.2d 377, 382 (10th Cir.1992)). The Second Circuit has further explained that, "[w]here both the plan administrator and a spurned claimant 'offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control.'" *Pulvers v. First UNUM Life Ins. Co.,* 210 F.3d 89, 92–93 (2d Cir.2000) (quoting *O Shea v. First Manhattan Co. Thrift Plan & Trust,* 55 F.3d 109, 112 (2d Cir.1995)). "However, [w]here the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious.'" *O'Shea,* 55 F.3d at 112 (quoting *Miles v. N.Y. State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 599 (2d Cir.1983)).

■ The court concludes that the plaintiff has failed to create a genuine issue of material fact as to whether Standard's review of the plaintiff's claim was arbitrary and capricious. Standard based its decision on the opinion of two medical professionals, Dr. Fancher and Dr. De-Mots, both of whom reviewed the plaintiff's entire claims file, including the medical records of the plaintiff's own treating physicians. These doctors arrived at a different conclusion regarding the source of the plaintiff's disability than the conclusion that Dr. Rossi, for one, would seem to have reached. This, however, does not render Standard's denial of benefits to the plaintiff devoid of reason or unsupported by substantial evidence. Standard's review process involved not only independent medical reviews of the plaintiff's claims file but review by several benefits analysts. Indeed, despite the plaintiff's unsupported allegations of the lack of independence of

the Quality Assurance Unit, Sabo's initial review of Leask's decision resulted in the remand of the file to the Group Benefits Department to obtain substantially more and updated medical records, including the latest reports of Dr. Rossi. The court cannot consider, nor could a reasonable jury find, such a process to be one without reason.

Moreover, the reports of Dr. Fancher and Dr. DeMots, created on the basis of a review of the entire claims file, amply represent evidence that a reasonable mind can accept as adequate to support the decision to deny the plaintiff disability benefits on the basis of "more than a scintilla but less than a preponderance." Furthermore, there is no suggestion that Standard imposed a standard not required by the Plan's provisions, or interpreted the Plan in a manner inconsistent with its plain words, or, by its interpretation, rendered some provisions of the Plan superfluous.

In short, the record demonstrates that Standard conducted a thorough review of the medical records of the plaintiff and the opinions of his treating physicians and the opinions of two doctors, including one cardiologist of Standard's own referral, and arrived at a decision, on the basis of the standards in the Plan, with which the plaintiff and perhaps his treating physicians disagree. This disagreement, however, does not render Standard's denial of benefits erroneous as a matter of law or otherwise arbitrary and capricious. Regardless of how another reasonable mind might have arrived at a decision on the plaintiff's eligibility for disability benefits on the basis of his cardiac condition, the court is not free to substitute its own judgment, or that of other medical professionals, for that of Standard, as the Plan's administrator, as if the court were considering the plaintiff's eligibility anew. The court can not, and in this instance will not, upset a reasonable interpretation by the Plan's administrator and finds that there is no genuine issue of material fact that would contradict the conclusion that Standard's denial of benefits to the plaintiff was not arbitrary and capricious.

 The plaintiff also alleges that Standard's decisionmaking process was tainted by a conflict of interest. The Second Circuit has explained that, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Jordan,* 46 F.3d at 1274 (quoting *Firestone,* 489 U.S. at 115, 109 S.Ct. 948) (internal quotation marks omitted). "In applying the arbitrary and capricious standard, however, a court must weigh as a relevant factor whether an insurer operates under an inherent conflict of interest, by both administering a plan and paying benefits out of its own funds." *Zuckerbrod v. Phoenix Mut. Life Ins. Co.,* 78 F.3d 46, 49 (2d Cir.1996).

 "However, the simple fact that the administrator of a plan ... happens to be 'an arm of the employer' does not in itself create a conflict of interest." *Jordan,* 46 F.3d at 1274 (quoting *Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1173 (3d Cir.1992)). Moreover, the plaintiff must "explain how such an alleged conflict affected the reasonableness of the [Plan's administrator's] decision." *Pagan,* 52 F.3d at 443. That is, "a reasonable interpretation of the Plan will stand unless the participants can show not only that a potential conflict of interest exists, ... but that the conflict affected the reasonableness of the [administrator's] decision.'" *Sullivan v. LTV Aerospace & Def. Co.,* 82 F.3d 1251, 1259 (2d Cir.1996) (quoting *Pagan,* 52 F.3d at 443). Accordingly, the

Second Circuit has provided the following standard:

> Following the standard of *Firestone* and *Pagan*, we conclude that, in cases where the plan administrator is shown to have a conflict of interest, the test for determining whether the administrator's interpretation of the plan is arbitrary and capricious is as follows: Two inquiries are pertinent. First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was in fact influenced by such conflict. If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan *de novo*.

*Id.* at 1255–56.

The conflict alleged by the plaintiff lies not, however, in a conflict of interest of the Standard acting as both the administrator and payor of benefits under the Plan. The plaintiff alleges, rather, that Standard's medical examiners, Drs. Fancher and DeMots were not *independent* medical examiners, largely because they were paid by Standard, but not paid well enough in the plaintiff's view. The plaintiff notes Dr. Fancher's use of Standard letterhead for his reports as proof that Dr. Fancher is not independent of Standard. The plaintiff also takes issue with Dr. Fancher's speciality as an internist rather than a cardiologist and whether Dr. DeMots reviewed the plaintiff's entire medical file in rendering his opinion to Standard. The plaintiff also argues that the Quality Assurance Unit cannot provide an independent review because the personnel in that Unit undisputably work for Standard.

As a matter of law, however, none of these alleged conflicts renders arbitrary and capricious Standard's decision to deny benefits unless a conflict affected the reasonableness of Standard's decision. *Id.* at 1259. The plaintiff has presented no evidence to suggest that any conflict of interest rendered the opinions of Dr. Fancher, Dr. DeMots, or any of Standard's analysts unreasonable. As noted earlier, the Quality Assurance Unit's relative independence from its colleagues in the Group Benefits Department is evidenced in part by Sabo's remand of the claims file after the Leask's first decision to deny to benefits on the basis of the plaintiff's heart condition. The fact that Standard compensated its two independent medical reviewers does not render their opinions unreasonable. Dr. Fancher's decision to issue memos on Standard letterhead, for purposes of communication with Standard personnel, strikes the court as unsurprising and hardly sufficient to indicate that Dr. Fancher was incapable of rendering an independent medical opinion on the basis of his review of the plaintiff's medical records. Despite ample conjecture as to the motivations of Standard's employees and independent medical reviewers, the plaintiff has failed to raise a genuine issue of material fact concerning any alleged conflict of interest on the part of Standard, its employees, Dr. Fancher, or Dr. DeMots.

The plaintiff further contends that Standard's decision is arbitrary and capricious because Standard never sought an independent examination of the plaintiff, although the plaintiff's policy allows for this. The plaintiff's policy under the Plan does provide that, "[a]t our expense, we may have you examined at reasonable intervals by specialists of our choice." Policy, at D 10016. Because the Plan does not require an independent examination, it is not *per se* unreasonable for Standard to deny the plaintiff benefits without requesting an independent medical examination, in light of

Standard's file review by two independent medical examiners. In so doing, Standard did not impose a standard not required by the plan's provisions, interpret the plan in a manner inconsistent with its plain words, or by the Plan's administrator's interpretation render some provisions of the plan superfluous. *See O'Shea,* 55 F.3d at 112.

 Rather, plan administrators, as trustees, "have an affirmative duty to seek expert advice when required." *Miller,* 72 F.3d at 1073. Standard did this, commissioning independent reviews of the plaintiff's file by Dr. Fancher and then, at the suggestion of Dr. Fancher, by Dr. DeMots, a certified cardiologist. Again, the plaintiff has not created any genuine of issue of material fact to suggest that Standard's decision was arbitrary and capricious due to Standard's failure to request an independent medical examination of the plaintiff.

The plaintiff also argues that Standard's decision is arbitrary and capricious because the Social Security Administration, as well as another disability insurer, decided that the plaintiff was disabled. However, the definition of "disability" which controls a decision by the Social Security Administration is not binding on the Plan's administrator under ERISA. *Kunstenaar v. Conn. Gen. Life Ins. Co.,* 902 F.2d 181, 184 (2d Cir.1990). As such, "a plan administrator is not bound by the determination of the Social Security Administration." *Gaitan v. Pension Trust Fund of Pension, Hospitization and Benefit Plan of the Elec. Indus.,* No. 99CIV3534NRB, 2000 WL 290307, at *5 (S.D.N.Y. Mar. 20, 2000); *see also Pagan v. Nynex Pension Plan,* 846 F.Supp. 19, 21 (S.D.N.Y.1994) ("Social Security determinations are likewise not binding on ERISA plans, and should not have unintended side effects on such plans not contemplated when the plans were initiated, or by Con-

gress in creating the Social Security disability structure."), *aff'd,* 52 F.3d 438 (2d Cir.1995). Standard is likewise not bound by the decision of Phoenix, another disability insurer, regarding the plaintiff's eligibility for benefits under an entirely separate insurance policy. As such, the court concludes that the decisions of these other entities raises no genuine issue of material fact as to whether Standard's denial of benefits to the plaintiff was arbitrary and capricious.

## IV. CONCLUSION

For the reasons stated above, Standard's Motion for Summary Judgment [Dkt. No. 17] is GRANTED. The Clerk is directed to enter judgment for the defendant on the plaintiff's claims and close the case.

**SO ORDERED.**